** NOT FOR PUBLICATION **

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| ELLSWORTH D. PATTERSON, JR. and KAREN PATTERSON, INDIVIDUALLY & AS H/W, | : : : : | Civil Action No. 10-6831(FLW) |
| Plaintiffs, | : : | |
| v. | : : | **OPINION** |
| GLORY FOODS, INC. AND McCALL FARMS, INC., | : : : | |
| Defendants. | : : : | |

---

**WOLFSON, United States District Judge:**

Plaintiff Ellsworth David Patterson, Jr. ("Plaintiff" or "Patterson"), a former employee of Glory Foods, Inc. ("Glory Foods"), filed this suit against Glory Foods and McCall Farms, Inc., which company merged with Glory Foods (collectively, "Defendants"), alleging that he was wrongfully terminated for being a "whistleblower" in violation of New Jersey's Conscientious Employee Protection Act ("CEPA").[1]  In the present matter, Defendants move for summary judgment on Plaintiff's CEPA claim. Upon reviewing the motion, this Court finds that: (1) Plaintiff was objectively unreasonable in his belief that his employer's business interactions were unlawful or

---

[1]    Ellsworth and Karen Patterson filed their initial Complaint on December 30, 2010, asserting the following counts: (I) wrongful termination, (II) violation of the New Jersey Conscientious Employee Act, and (III) loss of consortium. Thereafter, Defendants moved to dismiss Counts I and III, and both plaintiffs consented to the dismissal. Consequently, the Court dismissed Counts I and III with prejudice on May 10, 2011. Having dismissed Count III, Karen Patterson no longer remains a named plaintiff in this case and Count I is the only remaining cause of action.

unethical; (2) Plaintiff's emails to the President of Glory Foods did not amount to "blowing the whistle" within the definition of the CEPA; and (3) Plaintiff has not established a causal connection between his alleged disclosure and his ultimate termination. For these reasons, Defendants' motion for summary judgment is **GRANTED**.  Below is the Court's determination.

## I.    BACKGROUND[2]

### A.  Plaintiff's Employment with Defendant Glory Foods, Inc.

Plaintiff was employed by Glory Foods, a consumer retail company that sells vegetable products to supermarkets, as an at-will Area Sales Manager from October 2008 through March 12, 2010. (Defendants' Fact Statement ("DFS") ¶ 1, 4, 5); (Plaintiff's Response to Defendants' Fact Statement ("PR") ¶ 1, 4, 5; Pl.'s Dep. 106:13-15.) His job responsibilities at Glory Foods included monitoring retail pricing, developing relationships with retailers, partnering with brokers to create selling strategies, and reporting sales activities and results. (DFS ¶ 6; PR 6.) Plaintiff's immediate supervisor was Lisa Cliff ("Cliff"), the former Vice President of Sales at Glory Foods. (DFS ¶ 7; PR ¶ 7; Cliff Dep. 16:17-25.) Plaintiff's relationship with Cliff became tenuous over the course of his tenure at Glory Foods. (DFS ¶ 8; PR ¶ 8.)

### B.  Underpayment by Wakefern

In early 2010, Plaintiff exchanged a series of emails with President of Glory Foods, Jacqueline Neal ("Neal"), and Cliff regarding an accounting discrepancy of a payment made by Wakefern, a client that Plaintiff managed.  By way of background, before Plaintiff's employment, Wakefern failed to pay Glory Foods for certain products it

---

[2]    The Court will only recount relevant facts necessary for the resolution of this motion.

had received, resulting in a loss to Glory Foods in an amount between $100,000 and $200,000.   (Pl.'s Dep. 27:1-29:20.)   This discrepancy occurred during the tenure of Sharon Anderson ("Anderson"), who was the previous Wakefern account manager at Glory Foods.  (*Id*. at 29:23-30:2, 31:2-15.)  As a result of the discrepancy, Glory Foods entered into a "handshake agreement with Wakefern" whereby Wakefern would provide "free ads, waiv[e] new items and establis[h] an accrual program" in order to pay back the amount. (*Id*. at 30:11-16, 31:2-7.) This agreement was never memorialized in writing because the broker for the Wakefern client had "improperly filled out paperwork."   (*Id*. at 30:15-16.)    Nevertheless, the President of Glory Foods at the time, Barry Huff, implemented the Accrual Program, which, according to Cliff, ended sometime in 2007 – prior to Plaintiff's employment. (Cliff. Dep. 33:14, 34:2-3, 38:1-2.)

Plaintiff has explained that at the beginning of his employment he was unaware of the existence of the Accrual Program. Indeed, in late 2008 or early 2009, Plaintiff drafted a new contract with Wakefern without any provision of the Accrual Program.  (Pl's Dep. 51:7-52:11, 53:9-22.)   According to Plaintiff, he first became aware of the Accrual Program's existence when Anderson informed him of Wakefern's underpayment and the subsequent agreement at a trade function. (*Id*. at 30:11-16, 31:2-7.)  Plaintiff further explained that through meetings with Cliff and a broker for Wakefern, he was made aware of other information regarding the program, including that the underpayment was in the amount of approximately $100,000.[3]  (*Id*. at 26:6-15.)  Plaintiff "discovered" that in 2009, the sales figures relating to Wakefern were down from the previous year, and thus, he believed that this was due to the discontinuation of the Accrual Program. (*Id*. at

---

[3]    During his deposition, Allen testified that neither he nor Cliff knew how Plaintiff reached "his 100 to $200,000 number." (Allen's Dep. at 30:25-31:3.)

45:21-5, 46:1-7.)  Thereafter, Plaintiff made an initial inquiry to Wakefern brokers "Mike and Cyndi" to determine whether the program could be renewed.  (*See* Email dated November 12, 2009.)  Plaintiff later asked Cliff about both the underpayment and the Accrual Program. (Cliff Dep. at 43:19-25, 44:1.)   Cliff informed Plaintiff that the Program had ended prior to his employment.  At that time, Plaintiff did not further inquire about the Accrual Program and more importantly, he did not characterize this apparent "discrepancy" as a result of unlawful conduct on the part of Glory Flood.[4]

### C.  Plaintiff's Initial Communication with Neal

On the morning of February 24, 2010, Neal sent an email to the management team, including Cliff, informing them about a "2010 Plans discussion" meeting.  Around the same time, Neal sent an email to the Sales Team, which included Plaintiff, requesting that each salesperson review his or her clients and provide "comments, questions, or insight" that would be productive for the upcoming sales meeting.

Plaintiff responded to Neal on February 25, 2010, at 2:59 PM, writing, among other things, regarding the Wakefern client, that "[w]e were running different programs in FY 09 versus FY 10 that affected the current IRI number negatively. We have programs in place to address any of these declines." He explained that the figures in 2009 were approximately "70,000 cases," compared to "100,000 cases" in 2008 with the

---

[4]      Plaintiff also referenced a January 2010 meeting regarding the Wakefern client, during which Dan Charna, one of the owners of Glory Foods and its Vice President of Operations, told the room that Wakefern had "stolen $200,000."   (Pl's Dep. 27:11-13, 61:16-19.)  In attendance, among others, were Plaintiff, Allen, and new owners of Glory Foods from McCall Farms.  (*Id*. at 61:5-14.)  Plaintiff explains that this is another incident upon which he based his suspicion of wrongful activity on the part of Glory Foods.  However, Plaintiff never pursued his suspicion with anyone at Glory Foods after this incident, nor does Plaintiff provide any explanation as to this comment.

"program" in place, for a difference of "30,000 cases."[5] *Id*. at 47:4-17.  He copied Cliff

on this email. Thereafter, at 3:01 PM, Cliff immediately took issue with Plaintiff's

communication with Neal, and to that end, Cliff directed Neal not to send emails to Neal

without her approval.[6]

     Before Plaintiff had responded to Neal's email, Cliff had emailed Plaintiff and

"Dino" a task at 2:00 PM with the subject line "Customers that need to be increased by 4

[pm] today." Cliff had asked the two salespeople to "increase [the listed] numbers for the

team."  (*See* email dated February 25, 2010.) After Cliff saw Plaintiff's response to Neal,

she sent another email to Plaintiff at 4:16 PM, stating that the task sent to him at 2:00 PM

was "extremely important" and "takes place over whatever [Plaintiff was] working on . . .

." (*Id*.) Plaintiff admits that he missed the deadline; however, he reasons that he did not

see this email because it was not marked as high priority, and because he was working on

the task from Neal.  (Pl.'s Dep. 165:5-166:9.)

    **D.  Plaintiff's Final Email to Neal**

     Subsequently, on February 26, 2010, at 11:02 AM, Neal responded to Plaintiff,

asking him for "more information on Wakefern" regarding the "different vs Yago"

programs and what "specific programs" he had in place to address the declines. In his

response email to Neal, dated March 1, 2010, Plaintiff explained that

---

[5]    Apparently, there is a dispute as to when the Accrual Program ended. According to Plaintiff's belief, the program ended sometimes in fiscal year 2009, whereas Cliff stated that it ended in 2007.  For the purpose of this motion, this dispute is not material to the Court's determination.

[6]    Defendants also point to a prior instance in August 2009, where Plaintiff had sent Neal a direct email regarding an unrelated issue and was reprimanded by Cliff, who wrote in an email to Plaintiff: "YOU NEED TO STOP SENDING things to Jacqui without talking to me first!" DFS ¶ 21.

"[t]here was an accrual program in place at Wakefern prior to my arrival to the company. This program was set up to recoup the $100-200,000 over payment [sic] to Wakefern. The affect [sic] of the accrual program resulted in a positive growth of 41% in sales in 2008. However, the accrual program was not run in 2009 which resulted in a decrease of IRI numbers. Additionally, the price increase affected volume in 2009."

Plaintiff also explained the programs he had implemented to address the declines. Importantly, however, Plaintiff did not raise any issues regarding the alleged "scheme" involving the Accrual Program with Neal or Cliff after receiving both of Neal's emails dated February 24, 2010 or February 26, 2010.

### E.  Plaintiff's Discharge

After Plaintiff addressed the accounting issue concerning the Accrual Program to Neal, multiple events occurred, which led to Plaintiff's ultimate discharge. First, Cliff sent an email to Plaintiff and Mryon Allen, a subordinate of Cliff, asking Allen to discuss with Plaintiff his insubordinate conduct.  According to Plaintiff, Allen called him to inquire as to why Plaintiff raised the Accrual Program with Neal without first informing Cliff and advised him to report to Cliff so that Plaintiff would be instructed on how to properly respond to superiors. (Pl.'s Dep. 59:20-60:1.)  In his own words, Plaintiff claims that Allen had told him to "immediately cease any communications with the company concerning the accounting discrepancy with Wakefern." (*Id.* at 57:23-58:5.) However, according to Allen, he merely gave Plaintiff guidance regarding respect for the chain of command and for communicating "incorrect information." (Allen Dep. 29:7-11.)

Plaintiff claims that on March 12, 2010, Neal and Cliff held a telephone conference with him, wherein Cliff informed Plaintiff that "[d]ue to the recent merger with McCall Farms [Plaintiff's] job [was] being terminated . . . ."  (Plaintiff's Memorandum of Record dated May 5, 2010, p. 1.)  According to Plaintiff, Neal then

stated that Plaintiff's termination was not due to sales performance issues, but rather due to a personality conflict with Cliff, with whom "there had been several incidents and [Plaintiff] missed an important deadline to turn in sales numbers estimates."[7]   (*Id.*) Moreover, Neal noted that Plaintiff had not taken responsibility for the missed deadline or apologized for the incident.   In response, Plaintiff responded that he was unaware of such a personality conflict, as he had never discussed any issues with Cliff. (Pl.'s Dep. 69:20-21, 70:5-6.) However, Plaintiff revealed that he had been concerned about their relationship because "she did not listen to any ideas or suggestion that wasn't her own..." (*Id.* at 70:13-15.)  Ultimately, Plaintiff was terminated on March 12, 2010.

Defendant now moves for summary judgment on Plaintiff's CEPA claim, the only remaining claim in the Complaint.

## II.      STANDARD OF REVIEW

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* FED. R. CIV. P. 56(c); *Brooks v. Kyler,* 204 F.3d 102, 105 n. 5 (3d Cir.2000) (*citing* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d Cir.1999)(citations omitted). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson,* 79 F.3d at 1366.

---

[7]      Plaintiff asserts that the missed deadline referenced in the conference was the task assigned by Cliff in the email, dated February 25, 2010, with the subject line "Customers that need to be increased by 4 today."   (Pl.'s Dep. at 71:10-13.)

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249 (*citing First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)). In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n. 5 (*citing Anderson,* 477 U.S. at 249); *Big Apple BMW v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

## III.   ANALYSIS

Plaintiff alleges that Glory Foods terminated him for reporting the accounting discrepancy relating to Wakefern, which was the result of an illegal kick-back scheme. (Pl.'s Compl. ¶ 52.)  On this motion, Defendants argue that Plaintiff has not established a *prima facie* case under CEPA or met his burden of rebutting Defendants' proffered reason for his termination. The Court agrees.

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging" in such activity. *Abbamont v. Piscataway Tp. Bd. Of Educ.,* 138 N.J. 405,

431 (1994); *see also Barratt v. Cushman & Wakefield,* 144 N.J. 120, 127 (1996); *Higgins v. Pascack Valley Hospital,* 158 N.J. 404, 417 (1999).

Like New Jersey's Law Against Discrimination, CEPA reflects a "reaffirmation of [New Jersey's] repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge". *Lally v. Copygraphics,* 85 N.J. 668, 678 (1981). Indeed, New Jersey has consistently advanced a strong public policy against work place discrimination and promotes liberal construction of statutes and policies to further the remedial goals of all anti-discrimination work place protective legislation. "In enacting the NJLAD, the New Jersey Legislature expressed a strong public policy in protecting the State's residents against the practice of discrimination, which as the Legislature declared, 'threatens not only the rights and proper privileges of the inhabitants of this state, but menaces the institutions and foundations of a free democratic state'." *See Finding and Declaration of Legislature* N.J.S.A.10:5–3.

CEPA provides, in relevant part, that:

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following: a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ... (2) is fraudulent or criminal ... or c. Objects to or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law [;] ... (2) is fraudulent or criminal; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19–3.

To succeed on a CEPA claim, a plaintiff must prove four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. *See Kolb,* 320 N.J.Super. at 476; *Dzwonar,* 177 N.J. at 462. At base, CEPA covers employee complaints about activities the employee reasonably believes are: (i) in violation of specific statute or regulation; (ii) fraudulent or criminal; or (iii) incompatible with policies concerning public health, safety or welfare or the protection of the environment. *See Estate of Roach,* 164 N.J. at 610. Importantly, "CEPA does not require that the activity complained of ... be an actual violation of a law or regulation, only that the employee "reasonably believes" that to be the case." *Id.* at 613.

Once a plaintiff has established a prima facie case under CEPA, courts employ the well-established burden-shifting analysis that is used in federal discrimination cases involving "pretext" claims. *Blackburn v. United Parcel Services, Inc.,* 179 F.3d 81, 92 (3d Cir.1999). Under this test, "the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n. 2 (3d Cir.) (*quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Once the defendant articulates a legitimate reason for the adverse employment action, the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the plaintiff. *See id.* Then, "[t]o prevail at trial, the plaintiff must convince the factfinder 'both that the reason [given by the employer] was false, and that [retaliation]

was the real reason.' " *Id.* (*quoting St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). For summary judgment purposes, the court must determine whether the plaintiff has offered sufficient evidence for a reasonable jury to find that the employer's proffered reason for the discharge was pretextual and that retaliation for the whistleblowing was the real reason for the discharge. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995) ("[T]o defeat a summary judgment motion based on a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence."). Typically, the types of evidence that the plaintiff must point to are "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." *Id.* at 731.

### A.  Reasonable Belief

Regarding his reasonable belief, Plaintiff alleges that Defendants' failure to seek full repayment from Wakefern in an estimated amount of $200,000 was unlawful or unethical because "it is unheard of in his industry to not seek repayment of $200,000." (Plaintiff's Reply Brief ("PRB") ¶¶ 9-10.)  To establish that belief, Plaintiff explains that he believed that the discrepancy was the result of an unlawful scheme based, in part, on the fact that Cliff "informed Plaintiff to let the issue of the overpayment go" and never explained why "[Defendants] were not seeking repayment." (PRB ¶ 9.)  Plaintiff construes Cliff's alleged instructions as a "cover-up" of unlawful activities.  In addition, Plaintiff questions why "nothing was done to remedy" the overpayment after the Accrual Program ended for reasons unknown to him. *Id.* at 9.  Finally, subjectively speaking,

11

Plaintiff explains that because he encountered a similar experience at a prior company, where a failure to investigate into missing supplies and equipment was audited to reveal employee kickbacks and fraud, he is thus reasonable in his belief that such conduct could have occurred at Glory Foods. *Id.* at 10.

Even when liberally construing the facts in Plaintiff's favor, his claim fails because no reasonable jury could find that Plaintiff's belief -- that the discontinuation of the Accrual Program was motivated by an unlawful scheme -- was reasonable. Plaintiff presents no evidence to show that at the time he allegedly objected to the overpayment, he believed an illegal scheme took place. To the contrary, Plaintiff merely presented the issue of overpayment to management purely as a business matter. Indeed, Plaintiff claims that he formed his suspicions of alleged illegal activity from Cliff's silence on this subject, coupled with Plaintiff's previous encounter of fraudulent activity at a different job; both after-the-fact rationales. These reasons are insufficient.

For scenarios involving this type of conclusion-jumping rationale, the decision in *Blackburn v. United Parcel Service, Inc.* is particularly persuasive. 3 F.Supp.2d 504 (D.N.J. 1998). In *Blackburn*, the plaintiff expressed his concerns about the company's pricing policies over the course of several memos he wrote to fellow employees. *Id.* at 508. Specifically, he questioned management's practices as they related to anti-trust law and the potential for a current or future violation of such laws. *Id.* However, much like this case, his CEPA claim failed because "the memos and conversations show[ed] only that plaintiff, as he was obligated to do in his managerial capacity, brought several potentially problematic issues to his employer's attention." *Id.* at 514. The court concluded that the employee's belief "a law *might* someday be violated if...certain

changes are not made simply does not violate any law of which this court is aware." *Id.*
*See also, Falco v. Community Med. Ctr.*, 296 N.J. Super. 298, 308 (App. Div. 1997)
(holding that plaintiff's concerns regarding "management style" did not equate to
complaints about unlawful actions, and thus was unreasonable under CEPA); *Young v.*
*Schering Corp.*, 275 N.J. Super. at 237 (holding that CEPA "was not intended to provide
a remedy for wrongful discharge for employees who simply disagree with an employer's
decision, where that decision is entirely lawful.").

Here, Plaintiff's belief was unreasonable because the "discrepancy" and the
termination of the Accrual Program resulted apparently from an entirely lawful business
decision. While, under CEPA, Plaintiff does not have to prove that an unlawful activity
had occurred, his lack of evidence to the contrary buttresses the Court's finding that the
allegations of wrongdoing on the part of Glory Foods are insufficient to support
Plaintiff's belief that Glory Foods was involved in a "kick-back" scheme.  Indeed, to the
contrary, Cliff testified that when Plaintiff asked her about the overpayment to Wakefern,
she informed Plaintiff, and Plaintiff does not dispute, that this accounting discrepancy
occurred before Plaintiff's employment, and the Accrual Program was put in place to
address the issue.[8]  Cliff Dep. at 44:4-6.  Moreover, as Cliff explained, the program
ended in 2007 – nearly two years before Plaintiff began his employment -- because Glory
Foods and Wakefern mutually determined that the program should discontinued after a
year.  *Id.* at 43:6, 13-15, 44:4-17.  Although Plaintiff suggests that the program may have
been terminated in 2009, there is no evidence supporting this assertion.  Significantly,

---

[8]      Although Plaintiff claims in his Opposition Brief that Cliff insisted that Plaintiff
"ignore" the issue of the overpayment, Plaintiff fails to support his version of events
with any competent evidence.  Without any evidence, Plaintiff's accusation rings
hollow.

Plaintiff was specifically informed by Cliff that the issue of the overpayment had been resolved between the former President of Glory Foods and Wakefern. *Id.* at 44:14-19. Therefore, it appears Plaintiff's insistence that some unlawful conduct took place is merely based upon his own subjective belief regarding how Glory Foods' finances should be managed.

Furthermore, the facts of this case even fall short of the circumstances in *Blackburn*, where the plaintiff there at least relayed his concerns regarding a potential conflict with the company's policy and the law. The Court notes that CEPA plaintiffs must "have an objectively reasonable belief, *at the time of the objection*...that such activity is illegal [or] fraudulent." *Mehlman v. Mobil Oil Corp.*, 153 N.J. 163, 193 (1998). Here, Plaintiff provides no evidence whatsoever that he communicated his belief to Glory Foods that any unlawful activity transpired. In his initial email to Neal following her request for general sales comments, Plaintiff explained that with regard to Wakefern, Glory Foods was "running different programs in FY 09 versus FY 10 that affected the current IRI number negatively," but that he "had programs in place to address any of these declines." Plaintiff did not even reference the Accrual Program or any concerns regarding a possible illegal scheme. From its content, this email demonstrates that Plaintiff was merely commenting on or – at worst – criticizing the decisions of Glory Foods on the Wakefern account. More importantly, as noted above, Plaintiff offered this information **in response** to Neal's inquiry. What is more, only after Neal's further inquiry regarding the Wakefern account did Patterson mention the Accrual Program and its effect on sales numbers. For reassurance, Plaintiff informed Neal that he had put in place a specific program to counteract the alleged losses that resulted from the

Accrual Program's discontinuation.  At that time, it is apparent from Plaintiff's emails that he did not suspect any unlawful conduct; rather, it was business as usual.

      In sum, Plaintiff never conveyed in any conversation or email sent to Neal, Cliff, or any of his co-workers that he thought something illegal had occurred.  In that regard, Plaintiff not once referenced any law he thought the overpayment might have violated, much less his 11th-hour insinuation of fraud or a kickback scheme.  The Court finds that the evidence supports the conclusion that Plaintiff merely brought the issue to Neal's attention in the midst of carrying out the tasks of his job, not as a complaint or a red flag.[9] Therefore, there is no evidence that Plaintiff reasonably believed that a kickback scheme occurred; without such a showing, Plaintiff cannot sustain his *prima facie* burden.  On this basis alone, his CEPA claim fails as a matter of law.  *See Young v. Prudential Ins. Co. of America, Inc.*, 297 N.J. Super. 605, 627 (App. Div. 1997) (holding that "if [plaintiff's] belief, however sincere, was objectively unreasonable, his actions are not protected activity and his CEPA claim must fail.")

## B.  Whistleblowing Activity

Even assuming that Plaintiff has met the first element of a CEPA claim, this Court finds that Plaintiff cannot meet the "whistleblowing activity" element. Under section 3a, a whistleblowing activity occurs when an employee "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer or another employer with whom there is a business relationship, that the employee

---

[9]     Plaintiff stated in his submissions that he "raised this issue of kickbacks with the President of Glory Foods, Jackie Neal, in an email . . . ." PRB at ¶¶ 3.  However, this is contrary to Plaintiff's own testimony.  Plaintiff testified that he "spoke to [Neal] about the $200,000 on email so she's aware of that issue of the $200,000." Pl.'s Dep. 37:2-4. Moreover, there is nothing on the record that supports Plaintiff's assertion.

reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law." N.J.S.A. 34:19-3a. "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonable believe to be unlawful." *Mehlman,* 153 N.J. at 193-194. Thus, CEPA plaintiffs need not complain about the "exact violation" that occurred. *Hernandez v. Montville Tp. Bd. Of Educ.,* 354 N.J. Super. 467, 474 (App. Div. 2002).

However, courts have declined to view a CEPA plaintiff's proffered complaint as a whistleblowing activity when it makes no references to violations of the law. *See Boyle v. Quest Diagnostics, Inc.*, No. 05-CV-4463, 2008 WL 2242443, at *7 (D.N.J. May 29, 2008) (holding that plaintiff's CEPA claim failed in part because his alleged whistleblowing activity made no indication that plaintiff believed his employer's activities were in contravention of any law, or a rule or regulation promulgated pursuant to law). Likewise, the disclosure of complaints or disagreements about otherwise lawful employer actions has not been considered whistleblower activity. *See Young v. Schering Corp.*, 275 N.J. Super. 221, 237 (App. Div. 1994).

In that connection, it is well established that CEPA does not protect disclosures that are a regular part of the employee's job responsibilities. *See Massarano v. New Jersey Transit*, 400 N.J. Super. 474, 491 (App. Div. 2008) (holding that plaintiff was merely doing her job as security operations manager and was not a whistleblower under CEPA when she reported her findings and opinion regarding defendant's allegedly reckless disposal of documents); *Capanna v. Tribeca Lending Corp.*, 2009 WL 900156, *8 (D.N.J. 2009) (holding that plaintiff was merely performing her routine duties as a

loan underwriter in reporting an error regarding an applicant's occupation and salary to her supervisor and did not disclose or object to any unlawful activity or conduct by the company).

In the instant matter, Plaintiff alleges that he informed Neal of the accrual program, and in doing so, objected to conduct he reasonably believed was unlawful.[10] As previously stated, Plaintiff was not objectively reasonable in his belief that what he was reporting was unlawful. However, even assuming that he harbored this reasonable belief, neither the emails sent on February 25, 2010 or March 2, 2010, to Neal could be considered a whistleblowing activity for the purposes of CEPA. Plaintiff insists that these emails are the culmination of his efforts to object to Defendants' conduct.[11]  The Court disagrees.

Nothing in these emails can be reasonably construed as an objection in a CEPA context.  Indeed, as noted earlier, the February 25, 2010 email merely stated that "[Glory Foods was] running different programs in FY 09 versus FY 10 that affected the current IRI numbers negatively."  *See* Patterson's email dated February 25, 2010.  Significantly, contrary to any indication of wrongdoing, Patterson noted that he has put in place

---

[10]      In his brief, Plaintiff makes multiple arguments that lack proper citations to the record and are otherwise belied by the record.  To reiterate, Plaintiff asserts that he "raised the issue of repayment with Cliff and was instructed to ignore it." PRB, p.11. This allegation is not supported by any evidence. Second, Plaintiff states that he "knew Lisa Cliff would probably fire him if he raised the issue of the missing $200,000, because she was deliberately hiding the facts of the missing money from the Plaintiff." *Id*. This is yet another conclusory assertion unsupported by the record.

[11]      Plaintiff refers to his February 25th email to Neal as the "crucial" email which informed Neal of "the fact that the repayment program was stopped without reason, and without knowledge as to what was repaid by Wakefern and without any accounting performed by Glory Foods."  PRB, p.11.  However, that language is quoted from the March 1st email from Plaintiff to Neal.

"programs . . . to address any of these declines." *Id.* Even more obvious, in the follow-up email that references the Accrual Program, Plaintiff simply explains the program to Neal as he understood it, and sets forth steps that he was taking "to counter any losses from the prior year." *Id.* Clearly, not only did Plaintiff fail to object to any unlawful conduct in substance -- as the discontinuation of the Accrual Program in and of itself was not unlawful – but Plaintiff makes no mention or assertion whatsoever at the time he sent the emails to Neal that he believed the overpayment and the subsequent discontinuation of the Accrual Program referenced in those emails, were the result of an illegal scheme or unethical act. Moreover, fatal to Plaintiff's claims is his suggestions in those emails of ways to mitigate the company's losses from a business standpoint; this is compelling evidence which reveals Plaintiff's apparent disagreement over the discontinuation of the Accrual Program, rather than a seemingly *post hoc* belief of illegality. At best, Plaintiff was being critical of a management decision. However, this falls short of supporting a whistleblower activity. Accordingly, under no set of facts on this record can a reasonable jury find that Plaintiff objected to Glory Foods' conduct or that Plaintiff engaged in a whistleblowing activity. *See, e.g.*, *Boyle*, 2008 WL 2242443, at *7; *Young*, 275 N.J. Super. at 237 ("[CEPA] nevertheless was not intended to provide a remedy for wrongful discharge for employees who simply disagree with an employer's decision, where that decision is entirely lawful.").

Finally, as a last-ditch effort, Plaintiff points to the CEPA provision providing a cause of action for employees who refuse to participate in violative conduct and he claims, in a conclusory manner, that he was asked by Cliff and Allen to participate in illegal acts. Plaintiff does not specify what conduct he was asked to participate, nor did

he allege any in his Complaint.  Additionally, there is nothing in the record that would support Plaintiff's assertion in this regard.  Thus, this newly concocted theory of liability fails on this motion.

### C.  Causal Connection

Thus far, the Court has found that Plaintiff has failed to demonstrate the first two elements of a CEPA claim.  There is no dispute that Plaintiff presumably suffered an adverse employment action – termination of his employment.  As to the last element of causation, Plaintiff has failed to prove that a casual nexus exists between his alleged protected activity and termination.

To satisfy the element of causation, plaintiff must demonstrate that "a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar*, 177 N.J. at 462.  Plaintiff must show that the "retaliatory discrimination was more likely than not a determinative factor in the decision." *Donofry v. Autotote Sys., Inc.*, 350 N.J. Super. 276, 293 (App. Div. 2001) (citations omitted).  In analyzing the causal link between a protected activity and adverse employment action, courts often look to the temporal proximity because it is circumstantial evidence which CEPA plaintiffs may proffer to raise an inference that their protected activity was the likely reason for the adverse action. *Campbell v. Abercrombie & Fitch, Co.*, No. Civ.A. 03-3159, 2005 WL 1387645, at *7 (D.N.J. June 9, 2005) (*citing Kachmar v. Sungard Data Sys.,* 109 F.3d 173, 177 (3d Cir.1997)); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989).

> However, it is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The

element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.

*Id*. at *8 (citations and internal quotations omitted).

Here, as to causation, Plaintiff argues that the temporal proximity between the submissions of his emails and his eventual termination is highly suggestive that he was terminated for retaliatory purposes. Indeed, the record reflects that after sending the email dated March 1, 2010, Plaintiff was terminated from Glory Foods on March 12, 2010. However, notwithstanding the short time frame, Plaintiff cannot demonstrate causation because he was simply not a whistleblower. *See supra*, Section B. In *Blackburn*, the court found that plaintiff's actions did not constitute whistleblower activity, and therefore "plaintiff [could not] demonstrate the required nexus between a 'whistleblowing activity' and his termination." *Blackburn*, 3 F. Supp. 2d at 517. Equally applicable in the instant matter, Plaintiff could not have been terminated for "blowing the whistle" if he did not actually "blow the whistle." *Id*. Accordingly, for the reasons set forth above, Plaintiff has failed to demonstrate causation.[12]

---

[12]     Assuming that Plaintiff has established his *prima facie* case – which he has failed to do -- his CEPA claim would still fail as a matter of law. Indeed, Defendants have properly articulated legitimate, non-discriminatory reasons for the termination of his employment and Plaintiff cannot show that their reasons were pretextual. There is nothing in the record from which this Court can infer that Patterson's termination was the result of his whistleblowing activity – assuming Plaintiff was able to demonstrate on this motion of such activity. To the contrary, there is sufficient evidence to support Defendants' position that Plaintiff's termination was the result of missed deadlines, disrespect for the chain of command, and a merger with McCall Farms. Because the Court has found conclusively that Plaintiff cannot prove his *prima facie* case, the Court need not engage in an in-depth analysis of these reasons. Suffice it to say, Plaintiff cannot point to any inconsistencies or anomalies surrounding his termination that would be sufficient to defeat summary judgment.

**IV.     CONCLUSION**

For the aforementioned reasons, Defendants' motion is **GRANTED**.

**DATED**:  September 28, 2012                          /s/          Freda L. Wolfson
                                                                              Freda L. Wolfson, U.S.D.J.